# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEFF FARMER,

    Plaintiff,

    v.

WARDEN KEITH L. LYONS,
WARDEN RICKY FOXWELL,
OFFICER W. WAYLOR,
P. KNIGHT,
MIKE MUIR,
COMM'R OF CORRECTIONS,
INMATE GRIEVANCE OFFICE,
LT. HENRY LANDON,
OFFICER DANIEL ARNDT,
LT. STEPHEN ELLIOT,
OFFICER ADRION CHRISTOPHER,
OFFICER CHARLES WESTBROOK,
LT. ALONZO MURPHY,
LT. GREGORY WARD,
SHANIKA GUSTUS,

    Defendants.

Civil Action No.: PWG-18-567

## MEMORANDUM OPINION

    Plaintiff Jeff Farmer, a former inmate at Eastern Correctional Institution ("ECI") in Westover, Maryland, has filed an unverified complaint asserting claims against various state corrections officials and staff members.[1] Defendants have filed a motion for dismissal or, alternatively, for summary judgment. ECF No. 42. The Court advised Farmer of his right to file

---

[1]     Defendants are: the Commissioner of Correction, the Inmate Grievance Office, former Warden Keith L. Lyons, Warden Ricky Foxwell, Lieutenant Henry Landon, Lieutenant Stephen Elliott, CO II Daniel Arndt, CO II Adrion Christopher, Case Management Manager Mike Muir, CO II Charles Westbrook, Lieutenant Alonzo Murphy, and CO II Shanika Gustus. The Clerk is directed to correct the spelling of these Defendants' names on the docket.

an opposition to the motion and of the consequences of failing to do so. ECF No. 43. The Court also granted him an extension of time in which to file an opposition response. ECF Nos. 44, 45. Farmer, though, has not filed an opposition to the motion. Instead, he has moved for appointment of counsel and notified the Court of his impending release. ECF No. 46.

No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). As explained below, Farmer's motion is denied, Defendants' motion is granted, and the case is dismissed.

## BACKGROUND

In a Memorandum Opinion issued July 26, 2018, I summarized Farmer's pending claims as follows:

| January 19, 2016 | Refusal to assign to bottom bunk |
|---|---|
| July 13, 2017 | Assault by gang members; harassment by Officer Christopher; and refusal to move cellmate out |
| December 20, 2017 | Assault by Officers at ECI |
| December 20, 2017 | "Fraudulent" disciplinary charge and conviction |
| Dates unknown | Denial of access to administrative remedy procedure |
| February 13, 2018 | Denial of food and showers on segregation |

July 2018 Mem. Op. 10, ECF No. 24. All other claims raised were dismissed. *Id.* Each claim and Defendants' response to it are summarized below.

**A.     January 19, 2016 Bottom Bunk Assignment**

1.     Farmer's Allegations

Farmer first complains about an injury he suffered on January 19, 2016, when he fell off the top bunk in his cell and hurt his neck and back. *See* Am. Compl. 4, ECF No. 10-1. He says that "[f]or weeks" he told Lieutenant Alonzo Murphy that he "still had a valid bottom bunk slip,

2

which had been renewed in October 2015." *Id.* Farmer alleges he repeatedly explained to Lieutenant Murphy and other officers that he had pinched nerves in his back that caused his leg to go numb and made it difficult for him to climb to the top bunk, especially as there was no chair in the cell to assist him with the climb. *Id.* Farmer maintains that none of the medical explanations he provided to Lieutenant Murphy and other officers who worked in the housing unit were required of him, but he offered them in the hope that the problem would be resolved more quickly. *Id.* As a result, Farmer states he suffered worsening injuries "which can only be possibly fixed by having surgery performed." *Id.*

      2.   <u>Defendants' Response</u>

Lieutenant Murphy, the housing unit manager for the unit where Farmer was housed on January 19, 2016, acknowledges that Farmer told him prior to that date that he had a valid bottom bunk slip that would have allowed for him to be assigned to a lower bunk. Murphy Decl. ¶ 3, ECF No. 42-3. In response, Lieutenant Murphy contacted the ECI medical unit to verify whether Farmer had a valid bottom bunk slip. *Id.* Lieutenant Murphy explains that the medical staff have the sole authority to issue such slips and that, when he asked about Farmer, he was told Farmer did not have one. *Id.* Lieutenant Murphy explained this to Farmer and advised him that if he had been issued a bottom bunk slip from another prison he would need to get one from the ECI medical unit. *Id.* ¶ 3. Lieutenant Murphy also advised Farmer that he would not be assigned to a lower bunk without a valid slip from ECI medical staff. *Id.*

Verified medical records for Farmer dating from December 2015 to January 18, 2016, show he repeatedly complained of back pain; there is no record, however, of a request for an assessment for a bottom bunk assignment. *See* ECI Health Rs. 2-16, No. 42-4. The absence of such a record

is evidence that Farmer failed to request a bottom bunk assignment slip from ECI. *See* Fed. R. Evid. 803(7), and 803(10).

**B.     July 13, 2017 Gang Assault, Harassment, and Cellmate Reassignment**

1.     Farmer's Allegations

Farmer alleges that he was attacked by three gang members, one of whom brandished a knife, and that he was robbed of all his valuables. *See* Am. Compl. 11. While Farmer was being held in a cell in the Administrative Segregation Observation Area (ASOA), Lieutenant Landon and Officer Arndt questioned him about the assault. *Id.* Four inmates (Roger Terry, Jonathan Cook, Jose Reyes, and Mr. Hudd) were able to overhear the entire conversation. *Id.* When asked to name his assailants, Farmer explained he had only been on the tier for slightly more than 24 hours, had never met the men who assaulted him, did not know their names, and only knew they were members of a gang. *Id.* When Farmer was asked if he could identify the men from photographs, he told Lieutenant Landon[2] and Officer Arndt that it would not be difficult to do so, as there were only six or so inmates on the tier who were members of a gang. *Id.* Despite Farmer's assurance he could identify his assailants, no one ever presented him with photographs for that purpose. *Id.*

After the interview had concluded, the inmate who occupied the cell next to Farmer's repeated the entire conversation for everyone else on the tier to hear, "in case they missed it the first time." *Id.* Farmer's neighbor also indicated that he was affiliated with the gang responsible for the assault and signaled to Farmer he would make his "comrades" aware that Farmer was "telling on them." *Id.*

---

[2]     Lieutenant Henry Landon is incorrectly named "Lt. London" in the Amended Complaint.

"[A]fter a few days" Farmer was moved to "lock-up," where he remained because correctional staff accused him of refusing housing. *Id.* Farmer denies refusing a housing assignment and expresses disbelief that he would be asked to move back to the housing unit where he had been assaulted. *Id.* Farmer sent written requests to create an enemies list to a person identified only as "P. Knight" and to his supervisors, Muir and Bailey, as well as to the warden, assistant warden, "and others," but he received no responses. *Id.* Farmer later discovered the gang was offering a $200 bounty to any inmate who injured him because Farmer was by then known as a snitch. *Id.* He communicated this information to "case management," but no action was taken to protect his safety, and he remained housed among the general population. *Id.*

Farmer says he "also realized that they might actually put one of them [gang members] or their comrades in the cell with me," so he filed an Administrative Remedy Procedure (ARP) complaint. *Id.* He alleges that after he filed the ARP, he was forced to share his cell with members of the Bloods, Murder Incorporated, Black Guerilla Family (BGF), and Dead Men Incorporated (DMI). *Id.* at 12.

Farmer describes a November 21, 2017 incident between two inmates who shared a cell in the same housing unit. *See id.* at 14. He alleges they had begged correctional officers to move them out of the same cell, otherwise the two of them would fight. *Id.* According to Farmer, the officers told the inmates they would not be moved unless they fought and, because the inmates were not moved, they "beat the shit out of one another severely." *Id.* Still, Farmer's repeated complaints about the risk of a fight with his cellmate were ignored. *Id.*

Farmer implies that he assaulted his cellmate and that Officers Christopher and Sturgis pretended not to see the "2"-3" gash across his [cellmate's] nose" even as his cellmate left the cell several times each day under escort. *Id.* Farmer characterizes physical fights between inmates on

the tier as "entertainment" for the officers and refers to the practice as "ECI's Fight Club." *Id.* For example, Farmer reports that on one occasion, when his cellmate, Chris Brown, had left for court, Farmer ate food that Officer Christopher mistakenly had brought to the tier for Brown. *Id.* at 15. Farmer alleges that the lunch tray was put aside and he ate it because he was starving; when Brown returned from court, Officer Christopher allegedly told him that Farmer had eaten his lunch in an effort to provoke a fight. *Id.*

2.     Defendants' Response

Lieutenant Landon interviewed Farmer on July 13, 2017, concerning his report that he was robbed by three gang members. *See* Landon Decl. ¶ 3, ECF No. 42-6; Corrections R. 2-9, ECF No. 42-5. In an August 10, 2017 memorandum, Lieutenant Landon said he arranged the interview after Farmer, while being escorted through "East Medical," told Officer Morton that he feared for his life. *See* Corrections R. 9. Lieutenant Landon went to ASOA Cell 10 where he and Defendant Officer Daniel Arndt interviewed Farmer. *Id.*; *see also* Arndt Decl. ¶ 3, ECF No. 42-7. Farmer told Lieutenant Landon that "three white inmates rushed into his cell and robbed him at knife point." Corrections R. 9. When Lieutenant Landon asked if Farmer could "identify these individuals by their identification E-cards," Farmer refused to identify them or to provide a written statement. *Id.* Officer Arndt confirms Lieutenant Landon's account, adding that Farmer was interviewed in a cell away from other inmates. *See* Arndt Decl. ¶ 3. Lieutenant Landon reported that he made "every effort to keep [his] voice down so other inmate[s] could not hear what was said" but that Farmer was "agitated and raised his voice on occasion" during the interview. Corrections R. 9. Based on Farmer's refusal to identify his assailants, or to assist in identifying them, Lieutenant Landon concluded that "Farmer could not prove a credible threat" to his safety and he was therefore ordered to return to his unit. *Id.* When Farmer refused to do so, he was given

6

a notice of infraction for refusing housing. *Id.* The officer assigned to Housing Unit 6, C tier, where Farmer was housed on July 13, 2017, and where the alleged assault occurred, also prepared a report on August 21, 2017, indicating that Farmer had never approached him to report a threat to his safety. *See id.* at 10.

In response to Farmer's ARPs (ECI 2763-17 and ECI 2008-17) stating that his report of a threat to his life was not properly investigated, the warden found the complaint to be without merit. *See id.* at 5, 14. The identical response to both ARPs, dated November 16, 2017, states that an investigation was conducted into Farmer's allegations but that Farmer could not provide a written statement or positively identify the individuals who posed a threat to him or committed the robbery. *Id.*

Farmer's ARP (ECI 0328-18) concerning his claim that Officer Adrion Christopher was disrespectful and threatening to him was also dismissed after investigation. *See id.* at 18-23. Farmer had complained in part that Officer Christopher took "being cussed out personally," engaged in retaliation in response to that behavior, denied food to Farmer as punishment, threatened Farmer's safety, and ignored Farmer's warnings that his cellmate was trying to collect the $200 bounty from BGF and DMI by assaulting Farmer. *Id.* at 19-20. Officer Christopher denied the allegations against him,[3] and Farmer refused to cooperate with the ARP investigation. *Id.* at 21-23.

Officer Christopher provided a declaration under oath attesting that he never denied Farmer any meals, never arranged to have rival gang members or Farmer's enemies housed with him, and

---

[3]     Officer Christopher filled out a "matter of record" form on February 14, 2018. *See* Corrections R. 23. It does not specifically deny any of Farmer's allegations. Instead, it simply states that he had "always conducted myself in a professional manner (to include the traits of fair, firm, and impartial)" with regard to Farmer. *Id.*

did not tell other inmates that Farmer was an informant in an effort to have him killed. *See* Christopher Decl. ¶¶ 3-5, ECF No. 42-8. He further explains that his post assignment in disciplinary segregation did not include the authority to assign inmates to particular cells. *Id.* ¶ 4.

Farmer filed another ARP (ECF 327-18) on February 4, 2018, in which he alleged that he and his cellmate would be involved in a fight if they continued to be housed together. *See* Corrections R. 24. When the ARP was investigated, Farmer again refused to cooperate. *See id.* at 26. Although Farmer claimed to have submitted multiple written requests to be reassigned to another cell and that there had been physical fights with his cellmate, no evidence could be located to support either contention. *See id.* at 27-28.

According to Lieutenant Stephen Elliott, inmates can request to be moved to another cell if they provide "a verifiable legitimate basis" for the request, such as the threat of harm from a cellmate, but corrections staff cannot accommodate requests motivated by personal preference. Elliott Decl. ¶ 7, ECF No. 42-9. In Farmer's case, Lieutenant Elliott states he never received any information from Farmer indicating that he was facing an imminent threat of harm from his cellmate. *Id.*

Case Management Manager Mike Muir, meanwhile, attests he has no recollection of ever receiving any written requests from Farmer, nor of hearing Farmer say his safety was endangered by other inmates or staff. *See* Muir Decl. ¶ 4, ECF No. 42-12. Mr. Muir said his duties did not include "day to day inmate base file management," and any requests such as a change in cell assignment due to a threat to safety would have been forwarded either to custody staff or to the assigned case manager for investigation, as appropriate, or would have received a response from Mr. Muir. *Id.* ¶¶ 3-4. No such written request was received from Farmer. *Id.* ¶ 4.

### C. December 20, 2017 Assault by Officers

1. Farmer's allegations

Following an assault by Lieutenant Elliott and another officer on December 20, 2017, Farmer was no longer allowed out of his cell for a shower. Am. Compl. 20. Farmer said he initially believed he was denied showers because he had "scars and bruises" from the assault the officers were attempting to hide, but he said he later determined he was being mistreated because he wrote to Congressman Elijah Cummings to expose the corruption occurring at ECI. *Id.* Farmer alleges that Lieutenant Elliott told him to stop having people contact the prison on his behalf "because it will do no good." *Id.* According to Farmer, Lieutenant Elliott said he was empowered to do anything he wanted to do and there was nothing Farmer could do about it. *Id.*

2. Defendants' response

A search of Farmer's cell was conducted on December 20, 2017. Two officers were required to be present during the search. *See* Elliott Decl. ¶ 4. Lieutenant Elliott said he did not participate in the decision to search Farmer's cell. *Id.* Because Farmer was on disciplinary segregation at the time, he was not present during the search.

In an ARP (ECF 0329-18) alleging he had been assaulted by staff on December 20, 2017, Farmer stated that, after asking why his cell was "torn apart" during the search, he was "taken off camera" to be assaulted in an area where no one could see him. Corrections R. 29-30. Farmer alleged he was cuffed from behind and pushed into a holding cage, face first. *Id.* at 30. He said that after he asked to speak with Lieutenant Elliott, they had "heated words," and Lieutenant Elliott punched him twice in the mouth. *Id.* While Farmer asserted in the ARP, as in his Complaint here, that he had not been allowed to take showers for two months following the alleged assault, the ARP alleges in addition that he was scared to come out of his cell for sick call "or anywhere off

9

camera." *Id.* He added that he believed Lieutenant Elliott had been putting gang members in his cell with him, telling inmates that Farmer was a rat, or commanding officers to spread rumors that Farmer was a snitch. *Id.*

Lieutenant Elliott explained that, as a housing unit manager, he was primarily stationed in his office and did not have routine interactions with inmates on the tiers. *See* Elliott Decl. ¶ 3. He denied ever assaulting Farmer, engaging in a verbal argument with him, or keeping him "hidden away" so his physical injuries would heal. *Id.* ¶ 4. Lieutenant Elliott also denied writing three notices of infraction charging Farmer with rule violations for the sole purpose of prolonging his prison sentence, and denied conspiring with hearing officers to ensure Farmer would be found guilty of the violations. *Id.* He further explained that ARP complaints are "not continuously 'lost' when they arrive at [his] desk," as Farmer claims. *Id.* ¶ 5. Lieutenant Elliott maintained that he did not order that Farmer be denied meals or showers, nor did he direct officers to ignore normal procedures when dealing with Farmer. *Id.* ¶ 6.

When Farmer's ARP was investigated he again refused to be interviewed. *See* Corrections R. 32. The ARP was dismissed, as there was no evidence to support Farmer's claim that he was assaulted or harassed by staff or inmates as alleged. *Id.* at 29.

**D.    December 20, 2017 Fraudulent Disciplinary Charge and Conviction**

1.    Farmer's allegations

Farmer alleges that Lieutenant Elliott, during their "heated" exchange, "promised he was going get my release date pushed back" and charged Farmer with three rule violations that day. Am. Compl. 9. One of the charges resulted in a loss of 120 days' good conduct credits. *Id.* Farmer states the charge, possession of a weapon, was fraudulent. *Id.* He claims the charge stemmed from an officer finding a "drink bottle with ½ inch of drink mix in it" which was believed to be "a squirt

bottle with urine in it." *Id.* He maintains that the bottle could not have been used as a weapon with so little liquid in it and that "anyone with common sense" would know this. *Id.*

Hearing Officer Stephen Mack found Farmer guilty, and Farmer speculates that he did so because Lieutenant Elliott "is as powerful as he says" he is and spoke with Mr. Mack before the hearing because the hearing was "an obvious farce." *Id.* at 10. Farmer explains he was "only permitted to ask about 7-8 questions" and the witness was excused from the hearing before Farmer could ask why he thought there was urine in the bottle. *Id.* He also claims that the officer who escorted him to the hearing told him he had angered the wrong people and that he should make other plans because he was not going home as soon as he had hoped. *Id.* Farmer points to the exchange prior to the hearing as well as the manner in which the hearing was conducted as evidence that his guilt was predetermined. *Id.*

2.    Defendants' Response

The Notice of Inmate Rule Violation was issued to Farmer on December 20, 2017, following a search of his cell. *See* Corrections R. 36. The notice states in pertinent part that Officer Healey conducted a search of Farmer's cell and "[d]uring the search I found a mouthwash container with urine inside and a hole made at the top cap. This is what inmates use to throw urine on Officers." *Id.* Farmer was charged with "possess[ing], us[ing], or manufactur[ing] a weapon" and "possess[ing] or pass[ing] contraband." *Id.* The notice lists Lieutenant Elliott as the shift supervisor. *Id.* The only witness requested by Farmer was Officer Healey; the evidence he requested was "evidence of this supposed urine." *Id.* at 38.

Evidence presented at the disciplinary hearing by the institution to support a guilty finding included Officer Healey's report and photographs taken by Lieutenant Elliott. *See* Corrections R. 40-42. The photos were accompanied by captions, one of which described the content of the bottle

11

as having "a strong urine smell." *Id.* at 41. Farmer's claim at the hearing was that he was in the cell for a month or two and did not see the bottle; and he pointed out he had a cellmate. *See id.* at 40. The institutional representative indicated, however, that Farmer's cellmate was on "staff alert" at the time and was not housed in the cell with Farmer from December 16 through 26, 2017. *Id.* Based on this evidence, the hearing officer found the reporting officer's charge more credible than Farmer's claim and found Farmer guilty of violating both rules. *Id.* Warden Foxwell denied Farmer's appeal. *Id.* at 46-48. As noted above, Lieutenant Elliott denies conspiring with the hearing officer or threatening to prolong Farmer's sentence. *See* Elliott Decl. ¶ 4.

### E. February 13, 2018 Denial of Food and Showers

1.  Farmer's allegations

As background for this claim, Farmer asserts that he has been denied food many times at ECI and that officers at ECI act as though feeding inmates is "optional." Am. Compl. 13. He claims that the level of enforcement of many rules at ECI varies depending on the individual officers working at a particular time and are subject to change without notice. *See id.* On February 13, 2018, he alleges, Officer Westbrook "was running our tier" and decided not to feed Farmer or his cellmate. *Id.* Farmer claims he spoke with Lieutenant Elliott and Lieutenant Derr about the problem but neither corrected it. *Id.* Farmer filed an ARP (ECI 0383-18) "to document this behavior and to request the camera footage be preserved." *Id.* Farmer claims his ARP was ignored "like any other ARP" and that Officer Westbrook again denied him food on February 17, 2018. *Id.*

2.  Defendants' Response

Farmer's ARP was investigated by Captain Benedict; Farmer again refused to be interviewed regarding his claims. *See* Corrections R. 54. Captain Benedict did, however,

interview Officer Westbrook, Lieutenant Elliott, and Lieutenant Derr and also reviewed records and memoranda prepared by each. *Id.* Captain Benedict found the following facts:

> Inmate Farmer refused to cooperate with this investigation, inmate Farmer did not follow procedures as lunch trays were being handed out, his window was blocked. On 2-13-18 inmate Farmer refused medical sick calls and refused to unblock his window for his lunch tray. Officer Westbrook stated all verbal accusations against him are false. A review of the Confinement Sheet for the month of February shows on more than one occasion that inmate Farmer displayed verbally disrespectful and threatening statements to Staff working the tier, and multiple occasions as well when his window was blocked preventing him from being provided his meal, as it states in the Segregation Manual. [Lieutenant] Elliott reports making an effort to explain this procedure and expectations of his behavior. Inmate Farmer chooses to continue his non-compliant behavior.

*Id.* at 55; *see also id.* at 56-61 (supporting documentation). The warden dismissed Farmer's ARP. *Id.* at 52.

## STANDARD OF REVIEW

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the

light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court, however, also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## DISCUSSION

### A.     Motion to Appoint Counsel

In his Motion for Appointment of Counsel, Farmer includes a Notice of Change of Address indicating that he is no longer incarcerated. Mot. to Appoint Counsel 1, ECF No. 46. Farmer argues in his motion that the claims asserted in his complaint represent "extreme cases of illegal actions" and should not be dismissed on "technicalities and ignorance and inexperience of Pro Se plaintiffs." *Id.* at 1-2. He further alleges that this Court and others "use" summary judgment motions "to get rid of important serious legal violations, which allow[s] crimes to go unchecked and basically give[s] corr[o]borative permission for those crimes to continue." *Id.* at 2. Farmer expresses concern that the practices outlined in his complaint represent ongoing violations of the rights of prisoners confined at ECI and references matters that this Court has dismissed, such as the issue of water quality at ECI. *See id.*

A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable

claim but lacks the capacity to present it." *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989). Exceptional circumstances may be present where a litigant "is barely able to read or write," *Whisenant*, 739 F.2d at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008).

Farmer's filings in this case are lengthy, highly detailed, and clearly written. His motion urges me to consider the seriousness of his allegations, but other than noting that it can be difficult for inmates to seek and retain counsel, *see* Motion to Appoint Counsel 2, he does not explain why this Court should view him as incapable of representing himself in this matter. I note, too, that Farmer filed his motion only a "couple weeks" before he was due to be released, at which point, he acknowledged, it "will be easier to search for legal representation." *Id.*

Upon careful consideration of Farmer's motions and previous filings and of the relative merits of his claims as considered against the Defendants' filings, the Court finds that he has demonstrated no lack of ability with which to articulate the legal and factual basis of his claims or to secure meaningful assistance in doing so. Therefore, no exceptional circumstances exist that warrant the appointment of an attorney under § 1915(e)(1).

### B.    Motion to Dismiss or, Alternatively, for Summary Judgment

Defendants' motion to dismiss or, alternatively, for summary judgment has been pending since December 21, 2018. *See* Defs.' Mot., ECF No. 42. Given its title and the numerous exhibits attached to it, Defendants unquestionably put Farmer on notice that the Court may treat the motion as a motion for summary judgment. *See Tsai v. Md. Aviation*, 306 F. App'x 1, 4-5 (4th Cir. 2008). Notwithstanding this, Farmer has not filed a response in opposition to the motion. Neither did he request discovery under Rule 56(d). I am left, therefore, with an unverified complaint on the one

hand, and more than 100 pages of unrebutted declarations and corrections records on the other. It is against this backdrop that I consider Defendants' motion.

### 1. Eighth Amendment Claims

Claims asserted under the Eighth Amendment are subject to a two-part inquiry that includes both an objective and subjective component, each of which must be satisfied before liability is established. *See Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). Duties imposed on prison officials by the Eighth Amendment's prohibition against cruel and unusual punishment "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "[N]ot every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834)).

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a 'serious or significant physical or emotional injury'" or substantial risk of either type of injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014) (quoting *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010)). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a 'sufficiently culpable state of mind'" amounting to "'deliberate indifference' to inmate health or safety."

16

*Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 302 (1991)). Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was, in fact, drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence,'" so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Raynor*, 817 F.3d at 128 (quoting *Farmer*, 511 U.S. at 842). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016).

a.    Medical claim

Farmer's claim that he required a bottom bunk assignment due to a medical condition implicates the Eighth Amendment's prohibition against deliberate indifference to a serious medical need. To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to

either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (noting there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry, as there also must be a showing of "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40; *see also Anderson*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (internal quotation marks omitted) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").

Farmer alleges that Lieutenant Murphy refused to change his bunk assignment after he told him he had a "valid" bottom bunk pass. Am. Compl. 4. Under the subjective prong of the Eighth Amendment inquiry, the officer must have had actual knowledge of the risk of harm to the inmate, *see Iko*, 535 F.3d at 241 (citing *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001)); *Parrish*, 372 F.3d at 303 ("It is not enough that the officer[] *should have* recognized it; [he] actually must have perceived the risk."), and also must have "recognized that his actions were insufficient" to mitigate the risk of harm to the inmate arising from his medical needs. *Id.* (quoting *Parrish*, 372 F.3d at 303).

Lieutenant Murphy has attested that, after Farmer told him he had a bottom bunk pass, his response was to contact the medical department to verify Farmer's claim. Upon learning that the medical staff had not issued a pass, he passed this information along to Farmer and advised him to contact medical staff to be evaluated for such a pass.

Farmer has not disputed that only medical staff may issue such a pass, nor has he alleged that Lieutenant Murphy was authorized to do so. The record on this point shows only that Lieutenant Murphy was following protocol. Farmer, meanwhile, has not shown there were any obvious signs or symptoms that might have made Lieutenant Murphy or other correctional staff aware that he suffers from such a debilitating condition that his assignment to an upper bunk constituted cruel and unusual punishment. Defendants are therefore entitled to summary judgment on this claim.

b.    <u>Failure to Protect from Violence</u>

The Eighth Amendment also is implicated by Farmer's claim that correctional staff failed to take appropriate action after gang members assaulted him, that they failed to remove dangerous cellmates, and that they refused to create an enemies list. In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited "deliberate or callous indifference" to a specific known risk of harm. *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987).

> Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

*Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations and internal quotation marks omitted).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837; *see also Rich*, 129 F.3d at 339-40.

As this Court noted in a previous memorandum opinion in this case, prison officials cannot endeavor to protect an inmate from threats he has refused to identify or discuss. *See* July 2018 Mem. Op. 9, ECF No. 24. Following this Court's denial of injunctive relief, Farmer has offered no evidence to refute Defendants' proof that he refused to assist in investigating his claims that he was a target for potential violence warranting special precautions in his housing assignments. Prison officials are not required to accept a prisoner's vague and uncorroborated allegations. Here, Defendants have offered proof that they attempted to investigate Farmer's assertions, but he refused to cooperate with the investigation, and nothing they uncovered in the absence of his assistance corroborated his account. Accordingly, summary judgment in favor of Defendants is appropriate.

c.    Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This Court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not

dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 36-37 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 38.

Farmer alleges that Lieutenant Elliott punched him in the mouth twice and that another officer placed him into a holding cage and shoved him, face-first, into the chain-link fencing. Lieutenant Elliott provides a declaration under oath denying he ever assaulted Farmer, and Farmer fails to refute the assertion. The unverified complaint does not provide a basis for finding a genuine dispute of material fact regarding whether the incident occurred. Thus Defendants are entitled to summary judgment on this claim.

> d.  Conditions of Confinement (food and showers)

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that 'the deprivation of a basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (internal quotation marks omitted) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238.

Farmer's claim that he was denied showers and food as a form of punishment fails to satisfy the standard for an Eighth Amendment claim. The undisputed facts asserted by Defendants indicate that on the occasions when Farmer did miss a meal while confined in disciplinary segregation it was due to his refusal to comply with directives governing the manner in which meal trays are delivered to the cell. Farmer may not manufacture an Eighth Amendment claim through his own refusal to follow procedures for delivery of his meals. Further, Farmer has not alleged a resulting "serious medical and emotional deterioration attributable to" missing occasional meals or showers, a failure that is fatal to an Eighth Amendment conditions claim. *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990) (quoting *Shrader v. White*, 761 F.2d 975, 979 (4th Cir. 1985)). Summary judgment is therefore appropriate on this claim.

### 2. Fourteenth Amendment Claim

In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections. These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974). There is no constitutional right to confront and cross-examine witnesses or to retain or be appointed counsel. *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004). The hearing officer must, however, provide a written statement of the evidence upon which he relied and the reasons for the disciplinary action. *See Baxter*, 425 U.S. at 322 n.5. In addition,

substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985). Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact. *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980). The findings will be disturbed only when unsupported by any evidence, or when wholly arbitrary and capricious. *See Hill*, 472 U.S. at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990).

The evidence relied upon by the hearing officer to find Farmer guilty of the infraction for which he was charged far exceeded the constitutional minimum required. That evidence included the reporting officer's statement, his observation that the liquid inside the bottle smelled like urine, and pictures of the altered mouthwash bottle. There is no denial of federal due process protections where, as here, there was adequate evidence to support a finding of guilt and there was a hearing provided where Farmer was given an opportunity to put on a defense. Further, the existence of such evidence undercuts any claim that the finding of guilt was a predetermined result arrived at by an alleged conspiracy. I am therefore granting summary judgment in Defendants' favor on this claim as well.

### 3.    Remaining Defendants

#### a.    Supervisory Defendants

Farmer names as defendants the Commissioner of Correction, Warden Foxwell, and Warden Lyons, but he raises no specific allegations against them, and, outside of their positions as supervisory personnel, there is no discernible basis for their inclusion in this lawsuit. Naming a defendant solely on the basis of his position as a supervisor invokes the doctrine of *respondeat superior*. However, it is well established that this doctrine does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *see also Trulock v. Freeh*, 275 F.3d 391,

402 (4th Cir. 2001) (no *respondeat superior* liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Here, Farmer has failed to produce evidence that he suffered a constitutional injury of which Commissioner of Correction, Warden Foxwell, or Warden Lyons were actually or constructively aware. He has likewise failed to show that they did not adequately respond to his various complaints. Accordingly, summary judgment is granted in these defendants' favor.

b.     Unserved Defendants

Prisoner complaints that are frivolous or malicious or that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief, must be dismissed under 28 U.S.C. § 1915A(b). Furthermore, such a complaint may be dismissed prior to service or at any time after this Court determines that "the action or appeal (i)

24

is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

Named in the Amended Complaint, but for whom service was refused, are: P. Knight and Lieutenant Gregory Ward. Lieutenant E. Ward is mentioned in the record as the ARP coordinator at ECI. Corrections R. 9. To the extent Farmer intended to name the ARP coordinator at ECI as a defendant, he has failed to allege any facts to support a claim against him. Farmer's conclusory allegation that all of his ARP complaints were ignored is belied by the record evidence establishing that Farmer himself brought the investigations into his ARP complaints to a standstill by his refusal to be interviewed. The claim against Lieutenant Ward is therefore dismissed pursuant to the provisions of 28 U.S.C. § 1915 noted herein.

P. Knight is a case management employee at ECI who Farmer claims played a role in denying his requests for the creation of an enemies list. *See* Am. Compl. 10-11. As with his claim against Defendant Mike Muir, Knight's supervisor, there is no evidence to support Farmer's assertions that he repeatedly contacted ECI case management or that he provided reliable, succinct evidence that his life was endangered by a known inmate or group of inmates. This claim also is dismissed pursuant to the provisions of 28 U.S.C. § 1915.

### c.     Inmate Grievance Office

Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless the state consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* While the State of Maryland has waived its sovereign immunity for certain

25

types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202, it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court. *See Anderson v. Nutter*, No. AMD-04-2497, 2004 WL 3704204, at *4 (D. Md. Dec. 22, 2004). "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 99. Farmer's complaint against the Inmate Grievance Office, a state agency, is barred by the Eleventh Amendment.

## CONCLUSION

Defendants' motion, construed as one for summary judgment, shall be granted. The claims against any unserved defendant are dismissed. Farmer's Motion for Appointment of Counsel is denied. A separate order follows.

_____
Date

_____  7/24/19
Paul W. Grimm
United States District Judge